UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| DREW T.,[1] | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| *v.* | ) | No. 1:21-cv-1844-MG-JRS |
| | ) | |
| KILOLO KIJAKAZI, Acting Commissioner of the | ) | |
| Social Security Administration, | ) | |
| | ) | |
| *Defendant.* | ) | |

## **ENTRY REVIEWING THE COMMISSIONER'S DECISION**

In October 2018, Plaintiff Drew T. applied for applied for Supplemental Security Income ("SSI") from the Social Security Administration ("SSA"), alleging a disability onset date of July 1, 2015. [Filing No. 12-5 at 2-12.] His applications were initially denied on December 11, 2018, [Filing No. 12-4 at 2-5], and upon reconsideration on April 30, 2019, [Filing No. 12-4 at 6-14]. Administrative Law Judge Shelette Veal (the "ALJ") conducted a hearing on December 15, 2020. [Filing No. 12-2 at 36-57.] The ALJ issued a decision on January 7, 2020, concluding that Drew T. was not entitled to receive benefits. [Filing No. 12-2 at 18-30.] The Appeals Council denied review on April 30, 2021. [Filing No. 12-2 at 2-4.] On June 22, 2021, Drew T. filed this civil action asking the Court to review the denial of benefits according to 42 U.S.C. § 405(g). [Filing No. 1.]

The parties consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73. [Filing No. 7; Filing No. 8.] For the

---

[1] To protect the privacy interests of claimants for Social Security benefits, consistent with the recommendation of the Court Administration and Case Management Committee of the Administrative Office of the United States courts, the Southern District of Indiana has opted to use only the first name and last initial of non-governmental parties in its Social Security judicial review opinions.

1

following reasons, the Court **REVERSES** the decision of the ALJ denying Drew T. benefits and **REMANDS** for further proceedings.

## I.
### STANDARD OF REVIEW[2]

"The [SSA] provides benefits to individuals who cannot obtain work because of a physical or mental disability." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1151 (2019). Disability is the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." *Stephens v. Berryhill*, 888 F.3d 323, 327 (7th Cir. 2018) (citing 42 U.S.C. § 423(d)(1)(A)).

When an applicant appeals an adverse benefits decision, the Court's role is limited to ensuring that the ALJ applied the correct legal standards and that substantial evidence exists for the ALJ's decision. *Id.* For purposes of judicial review, "substantial evidence" is such relevant "evidence that 'a reasonable mind might accept as adequate to support a conclusion.'" *Zoch v. Saul*, 981 F.3d 597, 601 (7th Cir. 2020) (quoting *Biestek*, 139 S. Ct. at 1154). "Although this Court reviews the record as a whole, it cannot substitute its own judgment for that of the SSA by reevaluating the facts, or reweighing the evidence to decide whether a claimant is in fact disabled." *Stephens*, 888 F.3d at 327. Reviewing courts also "do not decide questions of credibility, deferring instead to the ALJ's conclusions unless 'patently wrong.'" *Zoch*, 981 F.3d at 601 (quoting *Summers v. Berryhill*, 864 F.3d 523, 528 (7th Cir. 2017)). The Court does "determine whether the ALJ built an 'accurate and logical bridge' between the evidence and the conclusion." *Peeters v. Saul*, 975 F.3d 639, 641 (7th Cir. 2020) (quoting *Beardsley v. Colvin*, 758 F.3d 834, 837 (7th Cir. 2014)).

---

[2] The regulations governing disability determinations for benefits under Title II and Title XVI are identical in virtually all relevant respects unless otherwise noted.

The SSA applies a five-step evaluation to determine whether the claimant is disabled. *Stephens*, 888 F.3d at 327 (citing 20 C.F.R. § 404.1520(a)(4); 20 C.F.R. § 416.920(a)(4)). The ALJ must evaluate the following, in sequence:

> (1) whether the claimant is currently [un]employed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the [Commissioner]; (4) whether the claimant can perform His past work; and (5) whether the claimant is capable of performing work in the national economy.

*Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000), *as amended* (Dec. 13, 2000) (citations omitted). "If a claimant satisfies steps one, two, and three, she will automatically be found disabled. If a claimant satisfies steps one and two, but not three, then she must satisfy step four. Once step four is satisfied, the burden shifts to the SSA to establish that the claimant is capable of performing work in the national economy." *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995).

After step three, but before step four, the ALJ must determine a claimant's residual functional capacity ("RFC") by evaluating "all limitations that arise from medically determinable impairments, even those that are not severe." *Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir. 2009). In doing so, the ALJ "may not dismiss a line of evidence contrary to the ruling." *Id.* The ALJ uses the RFC at step four to determine whether the claimant can perform His own past relevant work and if not, at step five to determine whether the claimant can perform other work. *See* 20 C.F.R. § 404.1520(a)(4)(iv), (v). The burden of proof is on the claimant for steps one through four; only at step five does the burden shift to the Commissioner. *See Clifford*, 227 F.3d at 868.

If the ALJ committed no legal error and substantial evidence exists to support the ALJ's decision, the Court must affirm the denial of benefits. *Stephens*, 888 F.3d at 327. When an ALJ's decision does not apply the correct legal standard, a remand for further proceedings is usually the appropriate remedy. *Karr v. Saul*, 989 F.3d 508, 513 (7th Cir. 2021). Typically, a remand is also

appropriate when the decision is not supported by substantial evidence. *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 355 (7th Cir. 2005). "An award of benefits is appropriate only where all factual issues have been resolved and the 'record can yield but one supportable conclusion.'" *Id.* (quoting *Campbell v. Shalala*, 988 F.2d 741, 744 (7th Cir. 1993)).

## II.
### BACKGROUND

Drew T. was 37 years old on July 1, 2015—the date of his alleged onset of disability. [Filing No. 12-6 at 9.] The ALJ found that Drew T. was found "not disabled" in decisions dated July 17, 2014, and June 14, 2018, and as such, the earliest date that he could be found disabled is June 15, 2018. [Filing No. 12-2 at 18.] Drew T. has at least a high school education and has past work experience as a fry cook and cashier and operator. [Filing No. 12-6 at 4.] Drew T.'s October 2018 application alleges that he can no longer work because he has asthma, diabetes type-2, degenerative disc disease, bulging disc in lower lumbar region, congestive heart failure, sleep apnea, cardiomyopathy, angina, schizoaffective bipolar disorder, PTSD, severe anxiety, dysthymia, and impulse control disorder. [Filing No. 12-6 at 3.] Following the December 15, 2020 hearing, the ALJ followed the five-step sequential evaluation set forth in 20 C.F.R. § 416.920(a)(4) and concluded that Drew T. was not disabled. [Filing No. 12-2 at 18-30.] Specifically, the ALJ found as follows:

- At Step One, Drew T. has not engaged in substantial gainful activity[3] since October 1, 2018 (the application date). [Filing No. 12-2 at 20.]

- At Step Two, Drew T. "has the following severe impairments: left hip impingement, morbid obesity, diabetes with neuropathy, chronic obstructive lung disease, degenerative disc disease, tachycardia, depression, schizoaffective

---

[3] Substantial gainful activity is defined as work activity that is both substantial (*i.e.*, involves significant physical or mental activities) and gainful (*i.e.*, work that is usually done for pay or profit, whether or not a profit is realized). 20 C.F.R. § 404.1572(a).

disorder, and opioid and cannabis abuse in alleged remission." [Filing No. 12-2 at 21.]

- At Step Three, Drew T. did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. [Filing No. 12-2 at 21.] The ALJ specifically considered Listings 1.02 1.04, 3.02, 3.03, 4.00, 9.00 and 11.02. [Filing No. 12-2 at 21.] As to the "paragraph B" criteria for Listings 12.04 and 12.08, the ALJ found that Drew T. had "moderate" limitations in two areas: (1) interacting with others and (2) concentrating, persisting, or maintaining pace ("CPP"); and "mild" limitations in two areas: (1) understanding, remembering, or applying information and (2) adapting or managing oneself. [Filing No. 12-2 at 22.]

- After Step Three but before Step Four, Drew T. had the RFC "to perform light work as defined in 20 CFR 416.967(b), except: the claimant can lift twenty pounds occasionally and ten pounds frequently. He can stand and/or walk for four hours of an eight-hour workday. The claimant can sit for six hours of an eight-hour workday. The claimant can occasionally climb ramps/stairs. He can never climb ladders, ropes, or scaffolds. The claimant can occasionally balance on level surfaces. He can occasionally stoop, kneel, crouch, and crawl. The claimant must avoid concentrated exposure to fumes, odors, dust, and gases. He must avoid all exposure to moving mechanical parts and unprotected heights. The claimant can perform detailed but not complex tasks. He can maintain sufficient attention and concentration to perform the tasks with reasonable pace and persistence. The claimant can have occasional contact with supervisors, coworkers, and the public. He cannot do tandem work, or work involving production quotas." [Filing No. 12-2 at 22-23.]

- At Step Four, the ALJ found Drew T. had no past relevant work. [Filing No. 12-2 at 29.]

- At Step Five, relying on the VE's testimony and considering Drew T.'s age, education, work experience, and RFC, the ALJ determined there are jobs that exist in significant numbers in the national economy that he can perform, such as final assembler, sorter and ink printer. [Filing No. 12-2 at 29-30.]

### III.
### DISCUSSION

Drew T. argues that: (1) the ALJ failed to consider Drew T.'s seizure disorder as a severe impairment and failed to consider it in light of the listing impairments; (2) the ALJ failed to adequately account for his "moderate" psychological symptoms and their impact on work function, including that his medical treatment schedule would require more absence than employer

tolerances; and (3) the ALJ's conclusion regarding Drew T.'s ability to stand and walk and the need for a walker were not supported by substantial evidence.

### A.   Seizure Disorder as a Severe Impairment

Drew T. argues that despite medical evidence and testimony, the ALJ improperly concluded his seizure disorder was not a severe impairment at Step Two. [Filing No. 16 at 20.] Drew T. argues the ALJ omitted any discussion of why she did not consider seizures to be a severe impairment, and only states she considered listing 11.02 and "[n]o treating or examining physician has mentioned findings equivalent in severity to the criteria of any listed impairment, nor does the evidence show medical findings that are the same or equivalent to those of any listed impairment of the Listing of Impairments." [Filing No. 16 at 20 (citing Filing No. 12-2 at 21).]

The Commissioner responds by stating at Step Two, the ALJ evaluated the medical evidence and Drew T.'s testimony concerning seizures and determined they were not a severe impairment. [Filing No. 17 at 6.] The Commissioner contends it is Drew T.'s burden to provide evidence that his impairments were severe, but his testimony to having six to ten seizures per day, lasting up to one hour, with after-effects lasting up to three hours was not supported by medical evidence. [Filing No. 17 at 6-7.] Further, the Commissioner argues Drew T. never underwent diagnostic testing to determine the cause of his seizure-like activity, and despite recommendations to see a neurologist, he never sought treatment from a specialist. [Filing No. 17 at 7.]

In reply, Drew T. argues his schizoaffective disorder interferes with his ability to manage medication and medical treatment decision making. In support, he argues that the Seventh Circuit has cautioned ALJs against placing too much weight on the noncompliance of mentally impaired claimants, noting that mental illness "may prevent the sufferer from taking her prescribed medicines or otherwise submitting to treatment." [Filing No. 18 at 4 (citing *Kangail v. Barnhart,*

454 F.3d 627, 630 (7th Cir. 2006)).] Drew T. argues that his erratic medical history and unclear treatment from neurologists is evidence of the impact of his medical conditions.

In general, the ALJ determines the severity of a claimant's mental impairment by assessing her degree of functional limitation in categories identified in the "paragraph B" and "paragraph C" criteria of the adult mental disorders listings. SSR 96-8p, 1996 WL 374184, at *4 (July 2, 1996). "[T]he limitations identified in the 'paragraph B' and 'paragraph C' criteria are not an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation process." SSR 96-8p, 1996 WL 374184, at *4.

An ALJ must provide sufficient analysis for the Listing that corresponds to each of a claimant's severe impairments. *See Ribaudo v. Barnhart*, 458 F.3d 580, 583 (7th Cir. 2006) (remanding where ALJ neither mentioned applicable listing nor evaluated whether claimant met that listing based on record evidence); *Scott v. Barnhart*, 297 F.3d 589, 595-96 (7th Cir. 2002) (same). A severe impairment is defined as an impairment that significantly limits a claimant's physical or mental ability to complete basic work activities. 20 C.F.R. §§ 404.1521, 416.921. To qualify for disability, a claimant must have a severe impairment that either has lasted or is expected to last for a period of at least twelve months. 20 C.F.R. §§ 404.1509, 416.909.

Listing 11.02 requires proof of either (1) generalized tonic-clonic seizures at least once per month for at least three consecutive months, or (2) generalized tonic-clonic seizures at least once every two months for at least four consecutive months with a marked limitation in physical functioning; understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; or adapting and managing oneself. 20 C.F.R. Pt.

404, subpt. P, App. 1, § 11.02(A), (C). In both categories, the seizures must occur "despite adherence to prescribed treatment." *Id.*

The Commissioner's response that the ALJ cured any failure at Step Three because the ALJ conducted "significant discussion of [Drew T.'s] seizure allegations throughout the decision" holds some merit. [Filing No. 17 at 7.] Yes, in assessing Drew T.'s seizures, the ALJ acknowledged his testimony of experiencing seizures "six to ten times per day, lasting from six to sixty minutes" and that he "is unable to speak after the seizures". [Filing No. 12-2 at 23-24.] The ALJ then later states that regarding his seizures, he presented to the emergency department on various occasions, including February 2018 (reporting experiencing six seizures in the last two days), March 2018 (reporting six seizures the day before and had been having two per week for the past month), two occasions in May 2019, and October 2020. [Filing No 12-2 at 25-27.] Further, the ALJ noted Drew T.'s reports to his internist in August 2020 (reporting that he was having three to four seizures per day) and in October 2020 (reporting that he still experiences some seizures). [Filing No. 12-2 at 26.]

However, nowhere in the RFC discussion did the ALJ "identify the requirements of the listing, let alone explain why the plaintiff does not meet them." *Horner v. Berryhill*, 2018 WL 3920660, at *2 (N.D. Ill. August 16, 2018) (remanding over Commissioner's argument that ALJ cured failure to adequately address plaintiff's migraines under Listing 11.02; ALJ made only a perfunctory analysis at step three and did not discuss whether plaintiff met the Listing's requirements elsewhere in his opinion). The ALJ merely states that she considered listing 11.02 and that "[n]o treating or examining physician has mentioned findings equivalent in severity to the criteria of any listed impairment, nor does the evidence show medical findings that are the same

or equivalent to those of any listed impairment of the Listing of Impairments." [Filing No. 12-2 at 21.]

Furthermore, an impairment need not have lasted for twelve months in the medical record to meet the durational requirement. To the contrary, an impairment meets the duration requirement if it is expected to last for a period of twelve consecutive months, even if it had not lasted for twelve months at the time of the decision. *See* SSR 82-52. Even if the ALJ found that Drew T.'s seizures didn't cause limitations for twelve months prior to the decision, the ALJ did not properly consider whether the seizures caused limitations that would continue for at least twelve months.

The ALJ failed to discuss Listing 11.02 in the face of record evidence chronicling significant impact of Drew T.'s seizures. This requires remand. *Scott*, 297 F.3d at 595.

### B.    Mental RFC

Next, Drew T. contends the ALJ erred in adequately accounting for his psychosocial symptoms, by failing to explain how a person can perform "detailed but not complex tasks" and "maintain the attention and concentration to perform the tasks with a reasonable pace and persistence" but "could not do tandem work or work involving production quotas", when the ALJ found he had moderate limitations in CPP. [Filing No. 16 at 14.] Drew T. argues that the Seventh Circuit has held that simply limiting a person to simple and repetitive work does not account for moderate CPP limitations. [Filing No. 16 at 14.] Further, Drew T. argues the Seventh Circuit has rejected the notion that restrictions to no production or pace work adequately account for moderate CPP limitations. [Filing No. 16 at 14.]

Drew T. then argues that the ALJ failed to sufficiently articulate the assessment of evidence of Drew T.'s absenteeism due to his medical treatment schedule, and whether this would preclude available jobs opined by the VE. [Filing No. 16 at 19.] Drew T. argues that the ALJ failed to

account for the fluctuating severity of his mental illnesses, which he argues would also go towards his absenteeism. [Filing No. 16 at 19-20.]

The Court will address these arguments in turn.

### 1.    Moderate CPP Limitations

The Commissioner argues that the ALJ's limitations were greater than any assessed by medical sources, which showed frequently normal mental status exams, and the ALJ properly considered the effectiveness of Drew T.'s treatments. [Filing No. 17 at 14-15.] Further, the Commissioner argues Drew T. does not present the Court with facts demonstrating he could not perform the work outlined in the RFC. [Filing No. 17 at 15-16.] The Commissioner then argues the limitations to simple work as an accommodation for moderate CPP limitations has been upheld if they are supported by the evidence, which the Commissioner argues occurred in this instance.

CPP "refers to the abilities to focus attention on work activities and stay on task at a sustained rate." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00E(3). A "moderate limitation" means that a claimant's functioning in a particular area is "fair." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00F(2). "'Fair' in ordinary usage does not mean 'bad' or 'inadequate.' So a 'moderate' limitation in performing at a consistent pace seems consistent with the ability to perform simple, repetitive tasks at a consistent pace." *Pavlicek*, 994 F.3d at 783.

"[W]hen an ALJ finds there are documented limitations of [CPP], the hypothetical question presented to the VE must account for these limitations." *Winsted v. Berryhill*, 923 F.3d 472, 476 (7th Cir. 2019). Employing terms like "simple, repetitive tasks" on their own will not necessarily account for problems captured by CPP. *Crump v. Saul*, 932 F.3d 567, 570 (7th Cir. 2019). This is so because "observing that a person can perform simple and repetitive tasks says nothing about whether the individual can do so on a sustained basis, including, for example, over the course of a

standard eight-hour work shift." *Id.* However, in certain cases, "[e]ven generic limitations, such as limiting a claimant to simple, repetitive tasks, ***may*** properly account for moderate limitations in [CPP], so long as they adequately account for the claimant's demonstrated psychological symptoms found in the record." *Urbanek v. Saul*, 796 F. App'x 910, 915 (7th Cir. 2019) (internal quotation and citation omitted) (emphasis added).

At Step Three, the ALJ found that Drew T. had a moderate limitation in CPP. [Filing No. 12-2 at 22.] The ALJ then assigned the following mental limitations in the RFC relevant to Drew T.s difficulties with maintaining concentration, persistence, or pace:

> [Drew T. can] perform detailed but not complex tasks. He can maintain sufficient attention and concentration to perform the tasks with reasonable pace and persistence. [Drew T.] can have occasional contact with supervisors, coworkers, and the public0 [sic]. He cannot do tandem work, or work involving production quotas.

[Filing No. 12-2 at 22-23.] At the hearing, the ALJ posed hypotheticals to the VE that were identical to the RFC. [Filing No. 12-2 at 54-55.] The ALJ went on to pose further hypotheticals regarding time off-task (20% of the workday) and absenteeism (three days per month), which the VE opined would preclude available jobs, but the ALJ did not include these limitations in the RFC or analysis. [Filing No. 12-2 at 55-56.]

There is ample medical evidence in the record related to Drew T.'s mental health during the relevant period. In 2018, Drew T. noted experiences of paranoia and irritability, and showed increased anxiety in February of that year due to lack of medication. [Filing No. 12-2 at 27.] He detailed improvement while on medication and increases of symptoms after running out of medication throughout 2018. [Filing No. 12-2 at 27.] In the later months of 2018, Drew T. told his psychiatrist he felt calm and was doing well, while still experiencing some anxiety, but was working thirty hours per week. [Filing No. 12-2 at 27.] In April 2019, Drew T. was discharged from mental health treatment for inconsistent attendance. [Filing No. 12-2 at 28.] The ALJ noted

11

Drew T. was diagnosed with opiate abuse, cannabis abuse, schizoaffective disorder, generalized anxiety disorder, and posttraumatic stress disorder. [Filing No. 12-2 at 28.] He presented to an emergency department with suicidal ideations in December 2019, experiencing hallucinations and complained his medications were not working—he later voluntarily admitted himself at a facility, but the ALJ noted no evidence he underwent inpatient treatment. [Filing No. 12-2 at 28.] The ALJ then noted Drew T. treated with psychiatrist Bets Rosiek, M.D. in 2020, where Dr. Rosiek noted a depressed mood, anger, anxiety, and auditory hallucinations upon intake. [Filing No. 12-2 at 28.] In August 2020, following injections of medication, Drew T. reported improvement, though indicated he was still experiencing hallucinations. [Filing No. 12-2 at 28.]

The Seventh Circuit has held that in some cases, limiting a claimant to "simple routine tasks that do not require constant interactions with coworkers or the general public" may be insufficient to properly account for moderate limitations in maintaining concentration, persistence, or pace. *Stewart v. Astrue*, 561 F.3d 679, 685 (7th Cir. 2009). This is due to a concern that using boilerplate language may create a "one-size-fits-all solution without delving into an individual assessment of the claimant's specific symptoms." *Bruno v. Saul*, 817 F. App'x 238, 242 (7th Cir. 2020) (citing *Martin v. Saul*, 950 F.3d 369, 373-74 (7th Cir. 2020)). Therefore, the Seventh Circuit has "decline[d] to provide a glossary of adjective for use in RFC determinations," and instead requires only that "the ALJ must account for the 'totality of a claimant's limitations' in determining the proper RFC." *Martin*, 950 F.3d at 374 (citing *Moreno v. Berryhill*, 882 F.3d 722, 730 (7th Cir. 2018)). However, generic limitations, such as limiting a claimant to simple, repetitive tasks, may properly account for moderate limitations in concentration, persistence, and pace, so long as they "adequately account for the claimant's demonstrated psychological symptoms" found in the

record. *See Jozefyk*, 923 F.3d at 498; *see also O'Connor-Spinner*, 627 F.3d at 619 (summarizing similar cases); *Johansen v. Barnhart*, 314 F.3d 283, 288-89 (7th Cir. 2002).

Here, the ALJ found that Drew T. can complete work that is detailed but not complex, and cannot do tandem work, or work involving production quotas. [Filing No. 12-2 at 22-23.] She further found that Drew T. can perform work with sufficient attention and concentration to perform tasks with reasonable pace and persistence. [Filing No. 12-2 at 22.] The ALJ also articulated that Drew T. could tolerate occasional contact with supervisors, coworkers, and the public. [Filing No. 12-2 at 22.]

While there is not much in the medical record regarding opined limitations in CPP, the ALJ relied on Drew T.'s function report, which stated "he was easily distracted, did not finish what he started, and had some difficulty following directions." [Filing No. 12-2 at 22.] Although the ALJ did not explicitly mention "moderate limitations in concentration, persistence, or pace" in her residual-functional-capacity assessment or in the hypothetical question, she noted that in December 2018 and April 2019, state agency psychologist consultants opined that Drew T. did not have any severe mental impairments. [Filing No. 12-2 at 28.] However, the ALJ found that "[t]hese opinions are not persuasive, as records submitted at hearing level reflect more severe mental symptoms that have more than a minimal effect on claimant's ability to engage in basic work activities." [Filing No. 12- 2 at 28.] The ALJ noted that Drew T. showed significant improvement in his mental symptoms when he was compliant with medication and opined that his sporadic work history prior to the alleged disability onset date, "rases a question as to whether [Drew T.'s] continuing unemployment is actually due to medical impairments." [Filing No. 12-2 at 29.] The ALJ did not err by relying on these opinions to craft Drew T.'s RFC.

The Commissioner's contention that Drew T.'s CPP argument fails because he has not identified a medical opinion opining that he has greater CPP limitations than those adopted by the ALJ has some appeal. The difficulty in applying this harmless-error-type rule here is the lack of explanation provided by the ALJ.

The ALJ seemed to recognize Drew T.'s CPP challenges with respect to staying on task when, in formulating an additional hypothetical for the VE, the ALJ incorporated the additional limitation of a person being off task (20% of the workday). [Filing No. 12-2 at 55-56.] The VE opined this time-off-task would preclude available jobs, but the ALJ failed to incorporate this opinion anywhere in the RFC and explain why the ALJ found this limitation inapplicable to Drew T., "leaving the RFC altogether uniformed by considerations of off-task time or unplanned leave." *Crump*, 932 F.3d at 570. The reviewing court is thus left to guess why the ALJ deemed Drew T. to have a moderate limitation in CPP and what limitations (if any) with respect to time off task that limitation caused. *See Kukec v. Berryhill*, 2017 WL 5191872, at *4 (N.D. Ill. Nov. 9, 2017) (remanding where ALJ posed 15%-off-task hypothetical to VE and then "failed to come to any conclusion regarding the off-task time [the ALJ] asked the VE to consider"); *Jacob D. v. Kijakazi*, 2021 WL 3674610, at *5 (N.D. Ill. Aug. 19, 2021) ("While an ALJ is not bound to any hypothetical, it is clear here the ALJ considered the issue of off-task time but then failed to provide any analysis of whether … [claimant] was limited by any off-task allowances and, if so, for how long."); *Pamela B. v. Saul*, 2021 WL 2411391, at * 8 (N.D. Ind. June 14, 2021) ("The ALJ was required to, at a minimum, discuss the VE's testimony concerning off-task time . . . and explain why … [claimant] would not be off-task more than 10 percent of the day.").

It may well be the case that the limitations opined by the ALJ are sufficient, but the Court is unable to trace the reasoning as to why the ALJ ultimately concluded that Drew T. would not

need a time-off-task accommodation in his RFC. Accordingly, remand is required for proper consideration and explanation of the RFC findings, including Drew T.'s limitations in CPP.

### 2. Absenteeism

The Commissioner then contends Drew T.'s argument regarding his treatment schedule absenteeism fails, as he has not demonstrated that his treatment schedule would cause him to miss work. [Filing No. 17 at 16.] The Commissioner argues that Drew T. withdrew from regular treatment in April 2019 and there is no evidence that he has resumed the same treatment schedule. [Filing No. 17 at 17.] Further, the Commissioner contends that there is no evidence or testimony as to how many bad days Drew T. has per month, and as such, the ALJ only needed to provide limitations to the extent they were supported by the evidence. [Filing No. 17 at 17.]

Once again, the Commissioner's argument that Drew T. does not point the Court to record evidence that would support further limitations beyond those opined by the ALJ has some appeal. Drew T. simply argues that the ALJ failed to account for the fluctuating severity of his mental illness and did not contemplate multiple missed days due to his varying mental health. *See Best v. Berryhill*, 730 F. App'x 380, 382 (7th Cir. 2018) (rejecting the argument that [Claimant] would be unemployable because of excessive absences due to medical appointments, because [Claimant] "cannot point to anything in the record to suggest that his appointments would require him to miss a full day of work or that he could not schedule his appointments outside of working hours"). However, while he has not demonstrated that any treatment schedule would cause work-preclusive absenteeism, the ALJ seemingly considered absenteeism in the hypotheticals to the VE (three days per month), which the VE opined would preclude available jobs, but the ALJ did not include this limitation in the RFC or analysis. [Filing No. 12-2 at 55-56.]. The ALJ's RFC analysis did not say

enough to either accommodate or rule out what the VE's testimony opined regarding absenteeism. *See Crump*, 932 F.3d at 571.

As mentioned previously, the Court is unable to trace the reasoning as to why the ALJ ultimately hypothesized an absenteeism accommodation to the VE but did not include such analysis in the RFC. Accordingly, remand is required for proper consideration and explanation of Drew T.'s absences due to medical treatment and any impact upon the RFC and hypotheticals to the VE.

### C.     Ability to Stand and Walk and Need for Ambulation Device

Drew T. next argues that the ALJ found that he was limited to standing or walking "only four hours per day, due to obesity and spine and hip abnormalities, as well as allegations of gait difficulties," but then goes on to state he does not medically need a walker. [Filing No. 16 at 16 (citing Filing No. 12-2 at 27).] Drew T. contends this decision does not explain how standing and walking for four hours is warranted, but the use of an ambulation device is not. Specifically, Drew T. notes the ALJ's citation to his riding an ATV in February 2018, arguing the ALJ did not explain how this activity from before the alleged onset period is relevant to later functional capacity. [Filing No. 16 at 17.]

The Commissioner argues that the ALJ's RFC finding was supported by substantial evidence that despite Drew T.'s complaints of back and hip pain, and his use of a walker at some doctor's appointments, medical evidence showed mild impairments and no prescriptions by doctors for the walker. [Filing No. 17 at 9.] The Commissioner contends that while Drew T. did not provide medical opinions regarding his physical functioning, and the ALJ considered only available medical assessments that showed slightly limited range of motion and normal gait, the ALJ ultimately provided greater restrictions for his standing and walking ability. [Filing No. 17 at 9.]

Further, the Commissioner argues Drew T. does not cite to any medical evidence supporting his argument and had the burden of providing evidence that he required regular use of a walker but did not provide such evidence at the hearing level. [Filing No. 17 at 11.] Lastly, the Commissioner argues that Drew T.'s attacks on the ALJ's subjective symptom analysis are insufficient, because (1) the ALJ's consideration of his daily activities and work history were appropriate, (2) his fall from the ATV occurred after the alleged onset date of disability and is within the adjudicatory period, and (3) Drew T.'s work record contradicts his allegations. [Filing No. 17 at 12.] The Commissioner contends that even if the ALJ's subjective analysis was in error, such error was harmless because the objective evidence and conservative treatment relied upon were inconsistent with Drew T.'s allegations. [Filing No. 17 at 12.]

In reply, Drew T. argues that while his alleged onset date is July 2015, he applied for SSI on October 1, 2018, and the earliest onset date for an SSI claim is the protective filing date. [Filing No. 18 at 2.] As such, he argues that activities occurring before the relevant period, such as riding an ATV and helping a friend move, have little bearing on his functional capacity for the period of October 1, 2018, to present. [Filing No. 18 at 2.]

Drew T. only asserts his use of a walker, citing no medical evidence or opinion supporting a medical necessity for him to use an assistive device, so his asserted need for an assistive device is subjective and falls within the ALJ's subjective symptom analysis. An ALJ's evaluation of subjective symptoms will be upheld unless it is patently wrong. *Shidler v. Astrue*, 688 F.3d 306, 310-11 (7th Cir. 2012). Nevertheless, the ALJ must provide specific reasons supporting his or her evaluation that are supported by the record. *Pepper v. Colvin*, 712 F.3d 351, 367 (7th Cir. 2013).

SSR 16-3p addresses the method by which ALJs should "evaluate statements regarding the intensity, persistence, and limiting effects of symptoms in disability claims." SSR 16-3p, *available*

*at* 2017 WL 5180304, at *1. SSR 16-3p eliminates "the use of the term 'credibility'" from the

evaluation process and clarifies that "subjective symptom evaluation is not an examination of an

individual's character. Instead, we will more closely follow our regulatory language regarding

symptom evaluation." *Id.* at *1. SSR 16-3p instructs ALJs to use the following method to evaluate

statements regarding the intensity, persistence, and limiting effects of symptoms:

> Consistent with our regulations, we instruct our adjudicators to consider all of the
> evidence in an individual's record when they evaluate the intensity and persistence
> of symptoms after they find that the individual has a medically determinable
> impairment(s) that could reasonably be expected to produce those symptoms. We
> evaluate the intensity and persistence of an individual's symptoms so we can
> determine how symptoms limit ability to perform work-related activities for an
> adult.

*Id.* at *2. Thus, ALJs use a two-step evaluation of an individual's subjective symptoms. First, an

ALJ must determine whether a claimant has "an underlying medically determinable physical or

mental impairment that could reasonably be expected to produce an individual's symptoms." *Id.* at

*3.

If the claimant is found to have such a medically determinable impairment at step one, the

ALJ moves the second step in which the ALJ must consider all evidence in the record to evaluate

the intensity, persistence, and limiting effects of the claimant's symptoms. To conduct this analysis

at the second step, SSR 16-3p instructs as follows:

> In considering the intensity, persistence, and limiting effects of an individual's
> symptoms, we examine the entire case record, including the objective medical
> evidence; and individual's statements about the intensity, persistence, and limiting
> effects of symptoms; statements and other information provided by medical sources
> and other persons; and any other relevant evidence in the individual's case record.

*Id.* at *4. When assessing credibility of a claimant's symptom testimony, the ALJ also considers

the factors set forth in 20 C.F.R. § 416.929(c)(3), *i.e.*, (1) a claimant's daily activities, (2) the

location, duration, frequency of the pain or other symptoms, (3) precipitating and aggravating

factors, (4) the type, dosage, effectiveness, and side effects of any medication, (5) treatment received for relief of pain or other symptoms, (6) measures the claimant uses to relieve pain or other symptoms, and (7) other factors concerning a claimant's functional limitations and restrictions due to pain or other symptoms. *Id.*

Ultimately, the ALJ must explain the subjective symptom analysis "in such a way that allows [a court] to determine whether [the ALJ] reached her decision in a rational manner, logically based on her specific findings and the evidence in the record." *Murphy v. Colvin*, 759 F.3d 811, 816 (7th Cir. 2014) (internal quotations omitted). And, "[n]ot all of the ALJ's reasons must be valid," to uphold a subjective symptom finding, "as long as enough of them are." *Halsell v. Astrue*, 357 F. App'x 717, 722 (7th Cir. 2009). Here, the ALJ's subjective symptom analysis was flawed in multiple respects.

The ALJ began by stating that Drew T.'s "medically determinable impairments could reasonably be expected to cause the alleged symptoms." [Filing No. 12-2 at 24.] The ALJ then noted, Drew T.'s "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." [Filing No. 12-2 at 24.] The Seventh Circuit has noted that it is a recurrent error made by ALJ's to discount pain testimony that cannot be attributed to "objective" injuries or illnesses. *Adaire v. Colvin*, 778 F.3d 685, 687 (7th Cir. 2015) (collecting cases); *see also* SSR 16-3p, 2017 WL 5180304 at *10 ("In evaluating an individual's symptoms, it is not sufficient for our adjudicators to make a single, conclusory statement that" the individual's statements about the his or her symptoms "'are (or are not) supported or consistent.'").

Although the ALJ did not devote a specific section of her decision to a discussion of Drew T.'s ability to effectively ambulate—and it would have been better had she done so—she

mentioned occasions in the records where Drew T. was observed, or he reported, using a walker or wheelchair, and the ALJ explored Drew T.'s asserted use of a walker during the hearing. The ALJ cited various inconsistencies regarding daily activities and need for an assistive device, such as "[u]se of a walker was mentioned on a few occasions in the second half of 2020, but it does not appear that it was prescribed", and "earlier records note activities such as helping a friend move and riding an ATV. There is no evidence of any event or injury that would explain the claimant going from engaging in these activities to barely being able to walk as alleged." [Filing No. 12-2 at 28.] The ALJ was aware of the evidence regarding his use of an assistive device, but she rejected any inability to effectively ambulate or need for an assistive device. [Filing No. 12-2 at 28.]

The ALJ noted that in Drew T.'s November 2018 function report, he reported needing help with personal care, and stated that he was able to prepare simple foods and do light chores. [Filing No. 12-2 at 24.] The ALJ further noted Drew T.'s wife had completed a third-party function report in November 2018, finding the opinion somewhat persuasive, but it was very similar to Drew T.'s own report and did not provide new information. [Filing No. 12-2 at 24.] At his December 2020 hearing, the ALJ asked whether he does any work around the house, including cooking or laundry, to which he responded in the negative. [Filing No. 12-2 at 48.] Drew T. testified that his wife does all house cleaning, laundry, dishes, and other chores. [Filing No. 12-2 at 48.]

While a claimant's activities of daily living are an appropriate factor for an ALJ to consider, the Seventh Circuit has "repeatedly cautioned that a person's ability to perform daily activities, especially if that can be done only with significant limitations, does not necessarily translate into an ability to work full time." *See Roddy v. Astrue*, 705 F.3d 631, 639 (7th Cir. 2013); *Mendez v. Barnhart*, 439 F.3d 360, 362 (7th Cir. 2006). "[F]ailing to recognize the difference between performing activities of daily living with flexibility (and often with help from family and friends)

and performing to the standards required by an employer 'is a recurrent, and deplorable, feature of opinions by administrative law judges in social security disability cases.'" (citing *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012)). Thus, when an ALJ considers a claimant's activities, the ALJ should consider not only what the claimant does, but also how the claimant goes about performing those activities and what effect the activities have on the claimant. *Craft v. Astrue*, 539 F.3d 668, 680 (7th Cir. 2008).

The ALJ observed from Drew T.'s November 2018 function report, that he used a back brace, but detailed no ambulation aids. [Filing No. 12-2 at 24.] The ALJ noted assistive device usage in an October 2020 visit to his internist (utilizing a walker), and during treatments with an orthopedist in August and October 2020 (brought to the clinic in a wheelchair). [Filing No. 12-2 at 26-27.] At his December 2020 hearing, Drew T. testified that he began using a walker in September of 2020 because his "hips will lock up or go out and . . . I can't walk without it. I can walk maybe from room to room, but I can't stand or sit for more than five or ten minutes." [Filing No. 12-2 at 43.] The ALJ asked Drew T. whether the walker was prescribed by any healthcare provider, to which he responded in the affirmative, naming Dr. Krepps—however there is no evidence in the record of Dr. Krepps providing a prescription for such a device. [Filing No. 12-2 at 46.]

The Seventh Circuit has previously found it "absurd" when an ALJ finds it suspicious that a claimant uses a cane when no physician had prescribed a cane because "[a] cane does not require a prescription." *Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010), *as amended on reh'g in part* (May 12, 2010). Here, the ALJ determined in Drew T.'s RFC that he could stand or walk for four hours of an eight-hour workday. [Filing No. 12-2 at 22.] However, the ALJ failed to adequately discuss the record evidence regarding Drew T.'s use of an assistive device. Further, as

explained above, Drew T. reported he is unable to complete many daily activities. While he may have been able to ride an ATV or assist in moving prior to his most recent filing date, the ALJ does not fully evaluate how the very limited daily activities Drew T. attests he can do in subsequent records and at the hearing—with noted limitations—translates to the ability to work full-time and stand for four hours without an assistive device.

Another factor an ALJ must consider in evaluating the severity of claimants' symptoms and limitations is the "type, dosage, effectiveness, and side effects of any medication [the claimants] take or have taken to alleviate [their] pain or other symptoms." 20 C.F.R. § 404.1529(c)(3)(iv). The record here contains years of medical evidence documenting Drew T.'s pain, treatment, and causes for the pain, supporting Drew T.'s testimony. Throughout the summary of medical evidence, the ALJ notes multiple instances of Drew T. presenting to doctors with complaints of lower back and hip pain, yet the ALJ does not explain why this medical evidence is inconsistent with Drew T.'s testimony regarding his ambulatory issues. Here, the ALJ observed that "[Drew T.] testified to hip and back pain. He said he is unable to stand or walk for more than five minutes. He said he uses a walker at all times. The claimant said he is not currently taking any pain medications, but plans to start treatment with a pain management specialist." [Filing No. 12-2 at 24.] An August 2018 lumbar spine MRI showed:

> developmentally narrow spinal canal exacerbating the effects of degenerative disc disease on canal and foraminal stenosis; mild disc bulge at L3-4 with moderate central canal stenosis with crowding of the nerve roots within the thecal sac; left foraminal disc protrusion at L3-4 causing moderate to marked left foraminal stenosis; and smallcentral disc protrusion at L4-5 and L5-S1 with only mild canal and foraminal stenosis at L4-5

[Filing No. 12-2 at 25.] From treatments with an orthopedist in August and October 2020, it was noted that Drew T. "had significant difficulty walking". [Filing No. 12-2 at 27.] An October 2020 left hip MRI was conducted and the ALJ observed that it "showed small left hip CAM type

deformity consistent with femoroacetabular impingement, and tiny focus of cartilage irregularity along the anterior super left femoral head with chronic appearing, likely degenerative type tearing of the left hip labrum." [Filing No. 12-2 at 27.] The ALJ observed that in October 2018 – January 2019 he was seen by a pain management specialist, [Filing No.12-2 at 25-26], and in October 2020, he was given a left hip injection, [Filing No. 12-2 at 27].

The ALJ acknowledged that Drew T. took medications and received injections but observed that treatment was limited mostly to pain medication and that he was not currently taking medication. [Filing No. 12-2 at 28.] The ALJ noted Drew T. met with an orthopedist on only two occasions and had only a few sessions of physical therapy and one injection treatment. [Filing No. 12-2 at 28.] However, the ALJ does not explain why limited medication and treatment correlates to Drew T.'s pain not being as persistent or intense as he testified. The ALJ also lists multiple pieces of medical evidence regarding Drew T.'s objective medical conditions and imaging but fails to provide any explanation how this medical evidence is inconsistent with Drew T.'s subjective symptom testimony requiring an assistive device.

Lastly, the ALJ discussed that in December 2018, state agency medical consultant J. Sands, M.D., opined that Drew T. "was capable of light work; could not climb ladders, ropes, or scaffolds; and could occasionally climb ramps/stairs, balance, stoop, kneel, crouch, and crawl." [Filing No. 12-2 at 27.] The ALJ considered Dr. Sands' opinion somewhat persuasive but found Drew T. required additional limitations including standing/walking only four hours per day, due to his obesity, spine and hip abnormalities, and allegations of gait difficulties. [Filing No. 12-2 at 27.] While the ALJ provided greater standing limitations than those provided by Dr. Sands' opinion, the ALJ did not provide specific reasons, supported by substantial evidence, why the record is inconsistent with Drew T.'s testimony of needing an assistive device to stand or walk, and therefore

the Court cannot assess how the ALJ evaluated the symptoms and remand is required. *Pepper*, 712 F.3d at 367; *Myles*, 582 F.3d at 676.

Overall, the ALJ failed to create a logical bridge of how Drew T.'s testimony and function reports of himself and his wife supports his ability to maintain full-time employment without an ambulation aid. Because the ALJ disregarded Drew T.'s subjective testimony of needing an assistive device for being inconsistent with the record and failed to provide specific reasons supporting such a finding, remand is required. *See Zurawski*, 245 F.3d at 887.

## IV.
### CONCLUSION

For the reasons detailed above, the Court **REVERSES** the ALJ's decision denying Drew T. benefits and **REMANDS** this matter for further proceedings pursuant to 42 U.S.C. § 405(g) (sentence 4) as detailed above. Final judgment will issue by separate entry.

Date: 9/30/2022

Mario Garcia
United States Magistrate Judge
Southern District of Indiana

**Distribution via ECF to all counsel of record.**

24